UNITED STATES v. STONE, SAND & GRAVEL CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 29, 1910.)

No. 1,893.

**1.** UNITED STATES (§ 67*)—PUBLIC IMPROVEMENTS—CONTRACTORS—BOND—ACTION.

A petition, alleging the advertising for bids for the improvement of certain public waterways, the execution of a contract on the bid of the S. Company for the performance of the work, the execution of a bond by defendant surety company to secure performance, the S. Company's failure to commence the work within the time prescribed, the granting of additional time by the government, its refusal to grant a second extension, the S. Company's failure to commence work within the time as extended, the cancellation of the contract, and the performance of the work under a subsequent contract with another at a higher price, stated a cause of action both against the S. Company and the surety.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

**2.** UNITED STATES (§ 67*)—PUBLIC WORK—CONTRACTS—ANNULMENT.

Where, after a contractor with the United States for a public waterways improvement failed to begin the work within the time fixed as extended, the government canceled a contract and entered into a subsequent similar contract with another contractor at a higher price, who completed the work at a higher cost, the cancellation of the original contract did not release the contractor or his surety from liability for the loss sustained.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

**3.** UNITED STATES (§ 67*)—PUBLIC IMPROVEMENTS—CONTRACT—CANCELLATION—DAMAGES.

Where, after the termination of a contract for public improvement by the United States for contractor's failure to commence work within the time fixed as extended, the government entered into another contract with another to complete the work at a higher cost, and such contracts were substantially similar, the second contract was competent evidence of damages for the default of the original contractor and his surety.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

Action by the United States against the Stone, Sand & Gravel Company and others. Judgment for defendants, and plaintiff brings error. Reversed, with directions.

Charlton R. Beattie, U. S. Atty., and W. J. Waguespack, Asst. U. S. Atty. (Chapman W. Maupin, of counsel), for the United States.

Thomas W. Bullitt (Howe, Fenner, Spencer & Cocke, of counsel), for defendant in error American Surety Co.

T. M. & J. D. Miller, for defendant in error Stone, Sand & Gravel Co.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. In March, 1899, and for some time previous to that date, the government of the United States was engaged in the work of restoring the harbor at Vicksburg, Miss., and caused the following notice to be duly published:

"U. S. Engineer Office, Vicksburg, Miss., March 2, 1899.

"Sealed proposals for excavating 7,500,000 cubic yards of earth, more or less, along route for diverting mouth of Yazoo river, near Vicksburg, Miss., under continuous contract, will be received here until 3 o'clock p. m., April 5, 1899. Information furnished on application. J. H. Willard, Maj. Engrs."

Ample written specifications were prepared, copies of which were furnished applicants. The object of the work was to give a new mouth or outlet for the various streams forming the Yazoo System of the Mississippi river, which shall be navigable at all seasons of the year, and at the same time to restore the harbor at Vicksburg, Miss. These specifications showed that the project authorized by Congress contemplates excavating about 7,500,000 cubic yards of earth, more or less, along the route selected from the junction of Yazoo river proper with a former bend of Mississippi river (A. D. 1797–1808), about 9.8 miles above present entrance of the Yazoo into the Mississippi, and following the "wrong end of Old river," cutting through a neck of low land from Old river to Lake Centennial, thence across Lake Centennial around the head of De Soto Island, and down the former channel of Mississippi river (1876) in front of the city of Vicksburg to deep water in the bend of Mississippi river at Kleinston Landing. The length of the proposed route is as follows: (Giving detail of total mileage aggregating 9.31 miles).

For this work, the defendant the Stone, Sand & Gravel Company (which we will call the "contractor company") submitted its bid, as follows:

"New Orleans, La., April 3, 1899.

"To Major J. H. Willard, Corps of Engineers, U. S. Army, Vicksburg, Miss. —Sir: In accordance with your advertisement and specifications of March 2, 1899, inviting proposals for diverting mouth of Yazoo river, Miss., and subject to all the conditions and requirements thereof, copies of both of which are hereto attached, and, so far as they relate to this proposal, are made a part of it, we (or I) propose to furnish the necessary plant and to excavate 7,500,000 cubic yards of earth, more or less, along the route selected and to deposit the material so excavated at places approved by the engineer officer in charge at eight and forty-nine one hundred cents (8.49 cts.) per cubic yard, measured in place; to begin active operations within six months after notice of award of contract, with sufficient force and plant for an output of not less than 260,000 cubic yards per month, which shall be increased within six months from date of beginning to give an output of not less than three hundred and thirty thousand cubic yards of excavation per month, unless the work is interfered with or stopped by floods, storms, epidemics, or other causes beyond control."

Accompanying this proposal there was filed a guaranty obligation signed by the contractor company and by the American Surety Company (which we will call the "surety"), in these words:

"We, Stone, Sand & Gravel Company of New Orleans, in the county of Orleans and state of Louisiana, and American Surety Company, of New York, in the county of Kings, and state of New York, hereby undertake that if the bid of Stone, Sand & Gravel Company herewith accompanying, dated April 3, 1899, for excavation for diverting mouth of Yazoo river, Miss., be accepted

within sixty days from the date of the opening of proposals therefor, the said bidder, Stone, Sand & Gravel Company, will, within ten (10) days after notice of such acceptance, enter into a contract with the proper officer of the United States to do the work required, at the prices offered by said bid and in accordance with the terms and conditions of the advertisement and specifications inviting said proposals, and will give bond with good and sufficient sureties for the faithful and proper fulfillment of such contract. And we bind ourselves, our heirs, executors and administrators, jointly and severally, to pay the United States, in case the said bidder shall fail to enter into such contract or give such bond within ten (10) days after said notice of acceptance, the difference in money between the amount of the bid of said bidder on the articles or services so accepted and the amount for which the proper officer of the United States may contract with another party to furnish said articles and services, if the latter be in excess of the former."

The bid of the contractor company was accepted, and the contract between it and the government was entered into on the 14th of June, 1899, in which there were, among others, these provisions:

"That the contractor company shall commence active operation under this contract on or before the 5th day of December, 1899, with sufficient force and plant for an output each calendar month of not less than two hundred and sixty thousand (260,000) cubic yards per month, which shall be increased on or before the 5th day of June, 1900, with sufficient force and plant for an output each calendar month of not less than three hundred and thirty thousand (330,000) cubic yards per month; provided, however, that if work shall commence before the date first above written in this paragraph the plant first put in operation shall have an assured capacity of not less than sixty-five thousand (65,000) cubic yards each calendar month, until December 5, 1899, and work shall not begin with less output. * * * That if, in any event, the party of the second part shall delay or fail to commence with the delivery of the material or the performance of the work on the day specified herein, or shall, in the judgment of the engineer in charge, fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements of this contract, then in either case, the party of the first part, or his successor, legally appointed, shall have power, with the sanction of the Chief of Engineers, to annul this contract by giving notice in writing to that effect to the party (or parties, or either of them) of the second part (the contractor company); and, upon the giving of such notice, all money or reserve percentage due or to become due to the party or parties of the second part by reason of this contract shall be and become forfeited to the United States; and the party of the first part shall be thereupon authorized, if an immediate performance of the work or delivery of the materials be in his opinion required by the public exigency, to proceed to provide for the same by open purchase or contract, as prescribed in section 3709 of the Revised Statutes of the United States: Provided, however, that if the party (or parties) of the second part shall by freshets, ice, or other force or violence of the elements, and by no fault of his or their own, be prevented either from commencing or completing the work, or delivering the materials at the time agreed upon in this contract, such additional time may in writing be allowed him or them for such commencement or completion as, in the judgment of the party of the first part, or his successor, shall be just and reasonable; but such allowance and extension shall in no manner affect the rights or obligations of the parties under this contract, but the same shall subsist, take effect and be enforceable precisely as if the new date for such commencement or completion had been the date originally herein agreed upon. * * * It is further understood and agreed that in case of failure on the part of the party of the second part to complete this contract as specified and agreed upon, that all sums due and percentage retained shall thereby be forfeited to the United States, and that the said United States shall also have the right to recover any or all damages due to such failure in excess of the sums so forfeited, and also to recover from the party of the second part, as part of said damages, whatever sums may be expended by the party of the first part in completing said contract,

in excess of the price herein stipulated to be paid to the party of the second part for completing the same."

The defendants gave their bond in the sum of $75,000, conditioned that:

"If the above bounden Stone, Sand & Gravel Company shall and will, in all respects, duly and fully observe and perform all and singular the covenants, conditions and agreements in and by the said contract agreed and covenanted by said Stone, Sand & Gravel Company, to be observed and performed according to the true intent and meaning of the said contract, and as well during any period of extension of said contract that may be granted on the part of the United States as during the original term of the same, and shall promptly make full payments to all persons supplying it labor or materials in the prosecution of the work provided for in said contract, then the above obligation shall be void and of no effect; otherwise, to remain in full force and virtue."

It is averred in the petition that, after the execution of the contract, the contractor company did apply to the government for an extension of time; that this extension was asked for on account of the inability of the company, without fault of its own and for causes contemplated by the contract, to commence the work within the time provided in said contract; and that the time was extended to January 24, 1900.

Upon the failure of the contractor company to prosecute the work within the term of the extension granted, the Chief of Engineers of the United States army did, on the 25th day of January, 1900, recommend that the contract be annulled and the work readvertised and relet. This recommendation was approved by the Secretary of War, and the contract was annulled, and notice was given to the contractor company and to the surety. After advertisement, and in accordance with law, the government contracted with the Atlantic, Gulf & Pacific Company, of New York, for the purpose of prosecuting and completing the work, under which contract (hereinafter called the "new contract") the work was prosecuted and completed at a cost to the United States of $228,201.91 in excess of the amount that the same work would have cost under the contract with the Stone, Sand & Gravel Company (which we will hereinafter call the "original contract").

To recover this amount this suit is brought, with prayer for judgment against both the defendants in solido in the sum of $75,000, and against the Stone, Sand & Gravel Company and its receivers in the further sum of $153,201.91.

The defendants answered, in substance, that; by the annulment of the contract, it, in respect to all rights and obligations of either and both parties thereto, became extinguished, and all liability on their part thereon ceased; and the surety specially pleaded that the extension of time granted to its codefendant was granted without the surety's knowledge, consent, or approval; that the terms and conditions of the new contract differed from those contained in the original contract, by which changes in terms and conditions the United States abandoned the original contract, and the surety was thereby released from obligation on its bond; and, further, that the new contract, so changed, forms no basis for measuring damages for the breach of the original contract. The surety's answer closes with the averment that the terms of the new contract had a tendency to cause bidders for the work under

it to ask a higher price upon the work to be done than would have been asked if the work had been let under the terms of the original contract; and the new contract forms no proper measure by which to estimate or calculate damages for the nonperformance of the original contract.

The action was tried in the Circuit Court before a jury. The record shows that, at the conclusion of the hearing of the evidence, the United States attorney moved the court to direct a verdict in favor of the government; and the counsel for the defendants moved the court to direct a verdict in favor of the defendants. After hearing the argument of the counsel on these motions, the court refused the motion of the United States attorney, and granted the motion of the counsel for the defendants; and, on the verdict so returned, gave judgment for both defendants.

The plaintiff assigns that the court erred: (1) In refusing to grant her motion; and (2) in directing a verdict against her.

The defendants contend: (1) That the petition does not state a cause of action against either of them; (2) that the annulment of the original contract released both of the defendants; (3) that the extension of time was such an alteration in the terms of the contract that the surety was released; and that the new contract differs so materially from the original contract that it forms no proper measure of damages for the default of the original contractor, and in effect operates a discharge of the original contract.

The first point is obviously not well taken. The others we group, and address to them some observations on the dealings between the parties.

The first step in the negotiations between the plaintiff and the defendants was the advertisement from the engineer's office for sealed proposals for excavating along the proposed route under continuous contract. Information furnished on application. That information showed the object of the work, the extent of it, and full particulars touching it. There is no question that the information was fully given and explained to the contractor company before it made its proposal for doing the work. The proposal was made in accordance with the advertisement and with the specifications, copies of both of which were attached to the proposal. The guaranty bond required, and given, bound both of the defendants to pay to the United States, "in case the bidder failed to enter into such a contract as is proposed and give the required bond, the difference in money between the amount of its bid and the amount for which the United States may contract with another party to furnish the articles and service, if the latter amount be in excess of the former." In satisfaction of this guaranty obligation, the contract was entered into by the Stone, Sand & Gravel Company, and the bond required was given by it and the surety. This constituted the continuous contract under which the service was to be performed. The contract shows that the parties contemplated that the contracting company might, by causes beyond its control and by no fault of it, be prevented from commencing or completing the work at the time agreed upon, and provided that such additional time might be allowed it for the commencement or completion thereof as, in the

judgment of the named officer of the government or of his successor, should be just and reasonable. Under this provision, which expressed in advance the consent of the surety, the first extension applied for was so far granted as to fix the time for beginning active operations under the contract at January 24, 1900. An application for a further extension was refused. The contract was duly annulled for failure to commence active operations under it within the time specified. Some preliminary experimental work had been done to the value, at the contract prices, of $6,206.69, which the defendants claim became forfeited to the plaintiff and extinguished all liability on the part of the defendants. This effort to split the contract into sections of liability, and wrest the meaning of the words "annul" and "forfeiture" from the signification which the whole dealings of the parties show should be given to them, does violence to the plain intent of the parties. The work was important in its magnitude and in the benefit it promised; it was of public interest that it should be done within a reasonable time, and be of efficient and lasting quality. It was in contemplation of the parties that the contractor might be unable to perform the work in the manner and in the time specified; and to prevent its being obstructed and delayed by the inability of the contractor to proceed arising out of causes within the control of an efficient contractor, provision for clearing the way of the government to do this work by such other means as it might be able to employ was made; and the word "annul," used in reference to that situation, should not be given a technical or narrow meaning, or be allowed to embarrass the administration of justice in dealing with conditions which call for only the application of the plainest common sense. Likewise, in reference to the word "forfeiture," we see nothing here to justify us in construing the provision in which that word is used to mean liquidated damages. To the contrary, it seems clear to us that in contemplation of the parties it signified a penalty to be looked to for the satisfaction pro tanto of such damage as might actually be incurred.

With reference to the new contract, no recovery is sought on it in this action. And it is not apparent to us how the so-called "substitutions" complained of can or could in any case affect the rights or liabilities of the defendants under the original contract.

We have read and compared the two contracts in question with studious care, and conclude that the defense attempted to be built on any variance in their wording is highly artificial and without substance. The new contract says:.

"No prior inspection, payment, or act, is to be construed as a waiver of the right of the government to reject any defective work or material or to require the fulfillment of any of the terms of the contract."

The specifications are a part of each of these contracts, and, speaking of the work and material, specification 31, attached as a part of the new contract, provides:

"The decision of the engineer officer in charge as to quality and quantity shall be final."

This is identical in word and letter with specification 32 attached to the original contract; and we cannot find in the original contract any

words to express or fairly imply that the final decision of the engineer officer during the progress of the work shall be construed as a waiver of the right of the government to reject any defective work or material whenever discovered; and, in the absence of any express language requiring it to be so construed, the courts would construe it not necessarily as the defendants do, but according to the conditions of each particular case.

The defendants' second specification in this connection is that the two contracts contain essentially different provisions respecting the effect of the annulment of the contract by the United States in case of default by the contractor. This is based on the defendants' construction of the provisions respecting the effect of the annulment of the contract as used in the original contract, which construction of the defendants we have attempted to show in the foregoing portion of this opinion is not sound, and that our construction of it makes it mean substantially what the provision in the new contract only more clearly expresses.

The defendants complain that the new contract contains a clause which is not in the original contract, to the effect that the contractor shall hold the government harmless against demands of any nature on account of the use of any patent, invention, article, or process included in the materials agreed to be furnished and the work to be done under the contract. In the original contract we find it expressly stated that the contractor shall be responsible for, and pay, all liabilities incurred in the prosecution of the work for labor and material. He had to furnish all labor and material. Any liability that he incurred therefor he was bound to meet, and, in law and substance, was as much bound for these charges under the original contract as is the contractor under the new contract.

The provision as to the time of beginning work and the limit of time within which the work shall be completed is substantially the same in each contract. Wherein the new contract differs, the difference is in favor of the contractor.

We conclude that both of the assignments of error are well taken. All of the work done under the new contract was embraced under the original contract; it was done under substantially the same specifications and stipulations, and it was shown to have cost the precise amount claimed in the petition. We think there is no substantial defense pleaded to the action, and on the trial there was no offer of proof tending to question the damage to the plaintiff in the amount claimed, and that amount was fully proved by competent evidence and the admission of the defendants.

To support their contentions, counsel for defendants have cited O'Connor v. Henderson Bridge Co., 95 Ky. 633, 27 S. W. 251, 983; Henderson Bridge Co. v. O'Connor, 88 Ky. 303, 11 S. W. 18, 957; Sparhawk v. United States, 134 Fed. 720, 67 C. C. A. 274; Quinn v. United States, 99 U. S. 30, 25 L. Ed. 269; Philadelphia, Wilmington & Baltimore Railroad Co. v. Howard, 13 How. 329, 14 L. Ed. 157; Farrelly v. United States, 159 Fed. 671, 86 C. C. A. 539.

In the Bridge Company Case, the annulment attempted to be made

was held to have been wrongful and invalid, and the decision has no application here.

In Sparhawk Case and the Quinn Case, it seems to us that the decision supports the right of the plaintiff in the case before us.

In our opinion, Railroad Co. v. Howard supports what we have advanced on the subject of forfeiture.

The case of Farrelly v. United States, 159 Fed. 671, 86 C. C. A. 539, appears, on a hasty reading, to support the contentions of the defendants; but the very eminent judge who wrote the opinion of the court in that case distinguished it from the case of United States v. Maloney, 4 App. Cas. (D. C.) 505, in a way that puts the case we have in the class with the Maloney Case. He says:

"In the Maloney Case the contractor wholly failed to do any work whatever. He wholly failed to commence work on or before the 16th day of June, 1891, which he had expressly agreed to do. There was a complete breach of the contract before action was taken under the annulment clause."

Precisely this case as we have resolved it.

It follows that the judgment must be reversed, and the case remanded to the Circuit Court, with direction to have judgment entered for the plaintiff against the Stone, Sand & Gravel Company and its receivers as such, and the American Surety Company, in solido, in the sum of $75,000, with legal interest from judicial demand, and against the Stone, Sand & Gravel Company and its receivers as such in the further sum of $146,995.22, with legal interest from judicial demand, being amount due the plaintiff after allowing the Stone, Sand & Gravel Company a credit of $6,206.69 for excavation done by it.

And it is so ordered.